UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY J. KUDSK,<br><br>  Plaintiff<br><br>  v.<br><br>FEDERAL SOLUTIONS GROUP, INC. et al,<br><br>  Defendant. | Case No. 2:19-cv-00389-GJS<br><br>**MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

This case arises out of various claims by and between Larry J. Kudsk *dba* Larry Kudsk Construction Services ("Kudsk"), The Vertex Companies, Inc. ("Vertex") and Fidelity and Deposit Company of Maryland ("F&D") concerning certain government construction projects.  The claims before the Court, described below, were tried from December 10 to 12, 2019.  Plaintiff filed a Motion for Judgement as a Matter of Law on the last day of trial [Dkt. 70], which the Court heard on February 5, 2020.  [Dkt. 84.]  Plaintiff's motion was denied on March 30, 2020.  [Dkt. 89.]

The parties thereafter filed post-trial briefing addressing the claims and counterclaim tried to the Court, the timing of which was impacted by the availability

of the Court reporter to provide the parties and the Court with transcripts of the proceedings. After further delay caused by the impact the COVID 19 pandemic has had on the Court and all civil litigants, the trial issues stand ready for decision.

## SUMMARY OF CLAIMS AND DECISION

The parties do not dispute the basic background facts in this case, *i.e.*, the situation that led up to the execution of the contracts into which they entered in 2017 and 2018. The Court will therefore only briefly summarize the parties' history together and what led to the disputes that remained when trial in this matter began. Where more detail is required, or where the parties disputed a material fact that the Court decides herein, such detail will be set forth in the appropriate section below.

This action is the remainder of two consolidated cases, one of which was originally brought in the Northern District of California. The Northern District case involved the "Moffett Field project," for which Kudsk was the roofing subcontractor. An entity known as BARA was the prime contractor. The Northern District case was transferred to this District on July 2, 2019, and defendant BARA was dismissed. Only Kudsk and F&D remain parties to the Moffett Field claims. As set forth below, the only remaining Moffett Field issue is how much is owed to Kudsk under the Miller Act, as Kudsk properly completed the work that he was obligated to do based on the original contract with BARA for this project.

The case brought here in the Central District concerns two projects, the "HVAC" and "Fire Alarm" projects, both of which were construction projects located at Vandenberg Air Force Base and are described further below. The parties generally involved in those claims and counterclaims are Kudsk, F&D, and Vertex. The prior general contractor in the Vandenberg related claims was Federal Solutions Group ("FSG"). FSG and BARA – neither of which is a party in the claims before the Court – were related entities, both owned by the same individual. Neither FSG nor BARA remain in business. Like BARA, FSG has also been dismissed without

prejudice from the consolidated actions before the Court.

The vast majority of the time spent at trial was devoted to the Vandenberg HVAC Project disputes. Kudsk sued both Vertex and F&D claiming breach of contract associated with the Vandenberg HVAC Project Subcontract Agreement and Ratification Agreement. Kudsk also sued F&D in a claim for compensation under the Miller Act payment bond. Vertex did not file a counterclaim against Kudsk on the Vandenberg HVAC Project, but F&D contends that it is a third-party beneficiary under the Subcontract Agreement and has sued Kudsk for breach of the Subcontract Agreement.

For the HVAC project, in summary form, Kudsk seeks: damages for (1) the unpaid Subcontract Balance, (2) extra work claims, and (3) extended field overhead based on work delays Kudsk encountered that were caused, according to Kudsk, by Vertex and the customer, *i.e.,* the Air Force.

F&D, as an alleged third-party beneficiary, contends that Kudsk abandoned the work required under the Subcontract and is thus entitled to no recovery for the work performed (beyond amounts already paid). F&D also countersues Kudsk for its alleged increased costs of completing the work.

With respect to the Fire Alarm project, there were five different projects – different physical areas – that were part of the original contract between the government and the original contractor for which F&D was the surety. The work on four of those projects was completed before the default of the original contractor. At issue with those four projects are Kudsk's claim that Kudsk is entitled to compensation for standing ready to complete any warranty work (although none was required), since warranty work was part of the original contract that F&D was required, as surety, to see to completion for the government.

Work never began on the fifth and final fire alarm project, located at the Vandenberg Temporary Living Facility ("TLF"). The primary issue here is whether Kudsk is entitled to (1) compensation for the preparatory work he did in an attempt

to get a "Notice to Proceed" to issue for this project; and (2) the profits he expected to make on this project even though he never received a Notice to Proceed and the TLF fire alarm project was never started, let alone completed. Kudsk essentially claims that Vertex had a duty under the subcontract to secure and approve a Notice to Proceed from the Air Force, for Kudsk's benefit, in a timely manner yet failed to do so.

The parties marked in excess of 250 trial exhibits on these issues. At trial, the exhibits were marked by project. Exhibits related to the Moffett Field related claim were marked with an "MF" prefix, those related to the Vandenberg HVAC project were marked with an "HVAC" prefix, and those related to the various fire alarm projects were marked with an "FA" prefix.[1]

The parties submitted declarations from the following witnesses which served as their direct testimony: Larry J. Kudsk, Samuel Reed, Paul Grego, and Alex Belooussov. The following witnesses appeared live for further examination: Kudsk, Reed, and Belooussov (Plaintiff chose not to cross examine Grego). The parties filed written objections to these declarations, on which the Court ruled at trial. The parties also stipulated that the Court could consider hearsay statements made by a BARA representative and one of Kudsk's subcontractors, although they later disputed the extent of their stipulation (*i.e.*, for what purposes the Court could consider the out of court statements). The Court notes that it did not rely on statements made by any witness who were not present or on-call for trial for the truth of the matter asserted in such statement in making the findings set forth in this Order. Certain other witnesses who had been identified in the parties' joint witness list, including a representative of the Air Force, were not called at trial.

Based on the evidence and argument adduced at trial as well as consideration

---

[1] Exhibits are therefore referenced by prefix and exhibit number. For example, HVAC exhibit number 4 would be referenced as "HVAC 4," Moffett Field exhibit 2 would be "MF 2," etc.

of the parties' post-trial briefing, the Court finds and holds that:

1. On the Moffett Field Project, Kudsk is entitled to damages in the amount of $93,190.50.
2. On the Vandenberg HVAC project:
    a. Kudsk substantially completed the work required under the subcontract. To the extent that certain work was not completed within the time parameters set by the Subcontract Agreement, Kudsk was prevented from completing such work or obtaining necessary extensions because of Vertex's breach of the Subcontract Agreement's payment provisions.
    b. Kudsk is entitled to damages in the amount of $236,910.89. This amount includes each of Kudsk's extra work claims, as the Court finds that the work performed was requested or required by the Air Force and/or Vertex and was outside the original scope of work to which Kudsk agreed.
    c. Given Vertex's breach of the Subcontract Agreement and Kudsk's substantial compliance with Kudsk's obligations under that agreement, F&D's claim against Kudsk for the costs of completing the HVAC project fail. F&D shall take nothing on this claim.
3. On the Fire Alarm Project, Kudsk is not contractually entitled to damages for either (a) the warranties on the four previously completed projects or (b) administrative work performed, or lost profits from, the TLF Fire Alarm project for which he never received a Notice to Proceed. Kudsk therefore takes nothing on the Fire Alarm project claims.

## DISCUSSION

### A. THE MOFFETT FIELD PROJECT

Very little background is necessary for a decision on the Moffett Field

project, as the parties agree on all the essential facts, and even previously agreed to an offer of judgement made by F&D to Kudsk. This section, in summary form, therefore serves as the Court's Findings of Fact and Conclusions of Law as related to Kudsk's Moffett Field claim against F&D.

The Miller Act states that "[e]very person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due." An action on a Miller Act payment bond "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." *Id.*, subpart (b)(4).

"The policy behind the Act is 'to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material." *Taylor Const. Inc. v. ABT Service Corp., Inc.*, 163 F.3d 1119, 1122 (9th Cir. 1998), citing to *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 217, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957). The measure of recovery under a Miller Act Payment Bond is "the sums due the party under the bonded contract." *Id.*, p. 1122.

The following facts are undisputed: The Moffett Field project began with the issuance on September 2, 2015, by the United States Air National Guard ("National Guard") of a Request for Proposal calling for bids for the replacement of the roof on a building located at Moffett Field, California. BARA was awarded the contract in a total amount of $446,000. F&D posted the Miller Act Payment and Performance Bonds pursuant to 40 U.S.C. §3133 for the Moffett Field Project. On March 27, 2016, Kudsk and BARA signed a written Subcontract Agreement in the amount of

$375,000.00, in which Kudsk agreed to perform the roofing work for the Moffett Field project. Kudsk performed the entirety of the work on the Project. BARA did not pay the complete amount owed to Kudsk for the work performed.

On September 15, 2017, Kudsk sued BARA and F&D in the Northern District case seeking the sum of $93,190.50, alleging breach of the subcontract agreement against BARA and an action on the Miller Act Payment Bond against F&D. KUDSK also claims that it is entitled to additional compensation in the amount of $12,346.86 for a roof top walkway it was directed to install by BARA.

F&D made an Offer of Judgment to pay Kudsk $108,190.00 on the condition that Kudsk resolve a Department of Labor ("DOL") Withhold against funds allocated to the Fire Alarm project (part of the Vandenberg projects discussed *infra*). Kudsk accepted. According to F&D, Kudsk failed to fulfill the condition until November 22, 2019. At that time, the DOL withhold on funds was released.

F&D argues that Kudsk's failure to clear up the condition put F&D at risk "of losing available funds" for the TLF (Temporary Living Facility) fire alarm project, and that "[i]t was this risk upon which F&D disputed the obligation to pay [Kudsk][2] for his work on Moffett Field." [Dkt. 92 (F&D Closing Brief) at 2.] F&D further argues that whatever amount it may owe Kudsk, it is entitled to an offset of this amount to any damages that F&D suffered as a result of the breaches by Kudsk of the Subcontract Agreement.

Although F&D maintains that Kudsk took an inordinate amount of time to clear the DOL Withhold, it did not present any evidence that any delay caused actual harm to F&D, *i.e.*, that the "risk" that caused F&D to withhold payment to Kudsk ultimately became a compensable harm. And notably, F&D acknowledged

---

[2] The parties often refer to Larry Kudsk Construction, or "LKC," in their papers. As Kudsk testified, LKC is essentially Kudsk himself and those he hires as needed for a particular job. To simplify the Court's order, the Court will use "Kudsk" when referring to Mr. Kudsk or to LKC.

7

at trial that the sum of $93,190.50 is still due and owing to KUDSK (subject to any possible F&D offsets). [Dec. 10, 2019 Tr. at 88:18-24.] F&D makes this same contention in its post-trial briefing. Kudsk's post-trial briefing apparently gives up any claim for an amount greater than $93,190.50. [E.g., Dkt. 90 (Larry J. Kudsk Post Trial Brief) at 3; Dkt. 93-1 (Kudsk Reply ("Defendant F&D acknowledged at trial that the sum of $93,190.50 is still due and owing to KUDSK subject to any possible F&D offsets. There are no factual issues related to this liability.") (citations omitted).] Consequently, the Court finds that Kudsk is entitled to $93,190.50. Furthermore, because the Court finds – as set forth in further detail herein – that F&D is not entitled to any damages on its counterclaim against Kudsk, there is nothing against which F&D may offset this amount owed to Kudsk.

### B. THE VANDENBERG HVAC PROJECT

The Court's ultimate conclusion with respect to the HVAC project is that Kudsk substantially performed under the controlling contracts – which include and are informed by the RFP to which he responded – or was stymied in his efforts to do so by Vertex and the Air Force. With respect to the HVAC project, the Court's findings of fact – and legal principles where necessary – are set forth in this section.[3]

On May 29, 2015, the Air Force issued a Solicitation, Offer and Award calling for bids to repair an HVAC system at Building 9190 at Vandenberg Air

---

[3] The claims and counterclaim here are for breach of contract and payment on the Miller Act bond (Kudsk against F&D and Vertex) and breach of contract (F&D against Kudsk). Inasmuch as the various claims turn on the same material factual issues and the parties do not dispute the controlling law (both sides cite to the appropriate California Jury instructions for the contract claims and agree on the strictures of the Miller Act, which are set forth above), the Court will not repeat that basic law here. The specific factual issues presented relate primarily to whether Kudsk substantially complied with the company's obligations under the Subcontract Agreement, *see, e.g.*, *Tolstoy Constr. Co. v. Minter*, 78 Cal. App. 3d 665, 671-72 (1978) ("The doctrine of substantial performance has been recognized in California since at least 1921.") (citations omitted), and/or was excused from doing so by virtue of a breach of the contract by Vertex or F&D.

Force Base in Santa Barbara County, under Air Force Contract No. FA4610-15-C-0018 (the "HVAC Project"). [HVAC 1]. The scope of the work for this project was to complete the design and thereafter build a replacement HVAC system for Building 9190 in accordance with the Statement of Work [HVAC 2], technical provisions [HVAC 3], the Concept Design for HVAC drawings issued by the Air Force [HVAC 4], as well as various referenced standards. FSG was awarded the project (FSG's bid was in the amount of $845,827.92) in August 2015. F&D posted the Miller Act Payment and performance bond pursuant to 40 U.S.C. § 3130 for the HVAC Project.

On December 12, 2016, FSG and Kudsk entered into a written subcontract agreement whereby Kudsk would essentially be the go-between with the Air Force, provide the field superintendent, and perform a limited amount of construction work. [Dec. 10, 2019 tr. at 122:9-11; HVAC 7.] While FSG was still in the picture, certain required design drawings were not completed to Air Force requirements. The Air Force informed FSG of its intent to terminate the Air Force/FSG contract based on FSG's failure, and a few months later, on November 8, 2017, F&D's legal counsel notified the Air Force that FSG was in voluntary default. F&D was obligated to finish the work under its Miller Act performance bond. No actual construction work had taken place on the HVAC project by this time.

On December 8, 2017, F&D and Kudsk signed a Ratification Agreement in which they ratified the subcontract agreement between FSG and Kudsk for the HVAC Project. [Kudsk Decl., ¶39; Dec. 10, 2020 tr. at 138:16-19; HVAC 12.] Recall that Kudsk's scope of work on its original agreement with FSG was limited, in that it did not include the majority of the actual construction work. F&D then paid $11,125.00 to Kudsk as specified under the Ratification Agreement [HVAC 8], and under Paragraph 4 of the agreement, Kudsk waived its rights against F&D through the date of the agreement. [HVAC 12.]

In the Fall of 2017, F&D retained Vertex to assist it in completing the HVAC

Project work.  [Grego Decl., ¶6.]  On January 8, 2018, Vertex issued a Request for Proposal (RFP) in which it sought bids from contractors to complete the HVAC Project in accordance with the Air Force Contract Documents.  [HVAC 14; Kudsk Decl., ¶40; Reed Decl., ¶7.]

On January 12, 2018, Kudsk submitted a proposal to Vertex offering to complete the HVAC work in accordance with the RFP and Air Force Contract Documents for the sum of $651,500.00.  [Kudsk Decl., ¶41; Reed Decl., ¶8; HVAC 15.]  Kudsk's proposal was the only one submitted to Vertex in response to the RFP.  [Kudsk Decl., ¶41.]  On March 9, 2018, Kudsk and Vertex entered into a written subcontract agreement in which Kudsk agreed to complete work on the Vandenberg HVAC Project.  [HVAC 18.]

The foregoing facts are not in dispute.  But after the new contract documents were executed and Kudsk began work on May 10, 2018, several disputes arose.  Ultimately, Kudsk contends he substantially completed the HVAC Project Work by January 11, 2019, including "additional work" for which he is due compensation.  F&D, on the other hand, contends that Kudsk refused to complete the required work, was therefore terminated by F&D, and that F&D thereafter incurred significant expenses to complete the work – expenses for which Kudsk is liable.

Some of the "subtext" or background disputes are important and inform the Court's decision with respect to this project.

First, was Vertex originally acting as a "consultant" or general contractor, and how did that impact, if at all, Kudsk's ability to communicate directly with the Air Force?  Initially – prior to BARA's default – Kudsk was communicating directly with the Air Force because that was the very reason BARA hired him.  The RFP issued by Vertex referred to Vertex as a "consultant" [HVAC 14 (page VER0004) (Vertex described as "consultant to F&D in administering the RFP process").]  In addition, Kudsk had originally signed the Ratification Agreement in which the company agreed to complete the work that was part of his original subcontract to

10

BARA/FSG. When Kudsk and Vertex later executed the written subcontract agreement, there was nothing in that agreement that prohibited Kudsk from dealing directly with the Air Force.[4] Based on the history of the project, and that there was no clear prohibition in the contracts that would prevent Kudsk from dealing directly with the Air Force, the Court finds that it was reasonable for Kudsk to expect that he was permitted to do so (although the Court finds that he had no "right" to do so once instructed otherwise by Vertex).

Kudsk offered testimony that the Air Force may have associated Kudsk with the defaulting general contractor with whom Kudsk originally worked, which may have given the Air Force a bad impression of Kudsk, whether deserved or not. Whether true or not, it is undisputed that Kudsk, when working for FSG, originally communicated directly with the Air Force. It is unclear whether Vertex's edict that he stop dealing directly with the customer was driven *by* the customer (as one Vertex witness testified, relying only on hearsay because no Air Force representatives were called as witnesses), or whether Vertex simply wanted to assure that all communications went through Vertex, as general contractor. Either way, once Vertex cut off direct communications, it thereafter failed its main task as a general contractor – it did not communicate information sufficiently down the chain to Kudsk or, more importantly as pertains to the claims here, up the chain from Kudsk to the Air Force to facilitate completion of the project in a timely fashion. This repeated failure was an impediment to Kudsk completing one hundred percent of the scope of work set forth in the Subcontract Agreement and its attachments.

---

[4] Article 2 of the Subcontract Agreement – drafted by Vertex – defines "The Subcontract Documents." [HVAC 18 at Page 1.] Paragraph 2.1 of Article 2 states that "other documents listed in Article 16 of this Agreement" constitute "Subcontract Documents." [*Id.*] Paragraph 16.1.4 of Article 16 of the Subcontract Agreement specifically lists the RFPs for the fire alarm and HVAC projects, which are thus part of the Subcontract Agreement.

1	Vertex also breached the Subcontract Agreement in a manner that further
2	interfered with Kudsk's ability to meet final completion deadlines. The Subcontract
3	Agreement required that Vertex pay Kudsk in a reasonable amount of time, noting,
4	for example, that "VERTEX agrees to pay submitted invoices within fifteen (15)
5	days of receipt from the CLIENT for the work itemized on the invoice." [HVAC18,
6	¶8.2; *see generally* Article 8 ("Payment to Subcontractor for Services").] It was
7	undisputed at trial that Kudsk submitted monthly invoices that were not addressed
8	for two to three months or more, even though Vertex had been paid by F&D for
9	work Vertex had done (and, at times, had apparently not sought payment from the
10	Air Force or F&D for work invoiced by Kudsk). [Dec. 11, 2019 tr. at 198:17 –
11	295:1 and exhibits cited therein.] And when Vertex did finally perform its
12	materially late review of Kudsk's invoices, it made very large deductions without
13	sufficient explanation to Kudsk. [*Id*; Kudsk Decl., ¶64 – 65] Based on the
14	testimony presented at trial, it remains unclear to the Court why the majority of the
15	deductions were appropriate.

16	With respect to some of the work Vertex and F&D contend Kudsk needed to
17	complete, this failure to pay timely was critical. Kudsk informed Vertex that one of
18	his subcontractors, Climatec, would not return to the jobsite because it had not been
19	paid for work already completed – work for which Kudsk had invoiced Vertex and
20	for which he had requested Climatec be paid directly if Vertex did not want to pay
21	Kudsk. Vertex ignored this specific plea, although once it "terminated" Kudsk, it
22	paid Climatec so that the work would be completed. [Reed Decl., ¶45; Dec. 12,
23	2019 tr. at 35:10-16.] No reasonable explanation was offered by any defense
24	witness as to why Vertex cut or discounted the amount paid to Kudsk for the work
25	already done and invoiced by Climatec; why at least that amount was not paid to get
26	Climatec back to the job site to close out the commissioning work when Kudsk
27	brought this to Vertex's attention; or why it was suddenly so easy to do so once
28	Defendants decided to terminate Kudsk.

In defense of its failure to assist Kudsk in seeking necessary extensions of time throughout the HVAC project, Vertex witnesses testified that Kudsk did not strictly comply with the requirements to request additional time that are set forth in the Subcontract Agreement. [HVAC 18, ¶¶ 6.5, 11.3; Dec. 12, 2019 tr. at 21:23 – 23:21.] The Court finds Kudsk's testimony that it was impossible to comply – to dot all of the "i's" and cross all of the "t's" – given the various situations causing the delay credible. For example, with respect to the commissioning work that could not be done because of the repeated failure of the Air Force boilers to be brought on line, Kudsk could not provide a definitive timeline for completion because the delay was ongoing. The problems causing the delay had not yet been resolved. [Dec. 11, 2019 tr. at 17:14-17; 23:4 – 24:11; 107:17 – 108:17.] Moreover, as Kudsk correctly points out, California law requires that a contract provision that essentially results in a forfeiture "must be strictly interpreted against the party for whose benefit it is created." Cal. Civ. Code §1442. In this case, Kudsk actually provided the vast majority of the requested information when he sought a change order or extension, yet, with one exception, Vertex refused to pass these requests on to the Air Force. In the one instance that the Air Force was provided with Kudsk's request, which the Air Force denied, Vertex refused to appeal that decision despite the fact that the Air Force's position was objectively unreasonable. The Court thus finds that Kudsk substantially complied with the obligations of Paragraph 11.3 of the Subcontract Agreement.

In sum, Vertex's repeated failures to communicate Kudsk's requests for additional time to the Air Force and its failure to timely pay Kudsk (so the company could continue operations and pay its own subcontractors) made it impossible for Kudsk to:

1. Obtain approval of extra work claims, or reasonably appeal Air Force decisions regarding the scope of work (for example, whether licensed personnel were required for certain electrical work and whether the type of

      commissioning ultimately performed was, in fact, part of the Kudsk's contracted scope of work);

2. Strictly comply with the requirements to request extensions of time to complete the project;

3. Obtain the manpower to complete certain tasks, because vendors Kudsk had hired to work on certain aspects of the project had not been paid for work already completed and would not return to finish work allegedly required by the Air Force for final sign off.

With respect to the completion timeline and whether or not Kudsk substantially completed the HVAC project in accordance with the contract or was excused from doing so, the Court finds and holds that:

1. Kudsk's extra work claims were reasonable and reflected requests made by Vertex to Kudsk for work that was outside the scope of the original agreements. While Defendants point to select portions of the Subcontractor Agreement, which includes an integration clause, to support their contention that certain items should be considered within the scope of work, they ignore that each and every prior agreement, as well as the RFP to which Kudsk responded, were attached to and incorporated into the final Subcontract Agreement. [See fn 3. *supra*.] To the extent that there were conflicts within the documents, or conflicts between the documents and the parties' course of conduct, such conflicts must be resolved against the general contractor and author of the Subcontract Agreement, Vertex.[5]

---

[5] The parties are intimately familiar with the specific technical disputes at issue, but in summary, they involved extra work claims related to replacement of refrigeration system lines and evaporators for walk-in refrigerators, the raising of Air Handler #2, modification of isolation pads under recirulation pumps, missing air measurement stations on air handlers, missing VFD on the recirculation pump, and an addition of an Exhaust Fans at a Janitor's Room. The disputes related to the scope of HVAC commissioning that was required included the Air Force's direction to use "certified

2. Kudsk substantially completed, or was excused by Vertex's behavior and the Air Force's technical problems (in particular, the non-functioning boilers that were the Air Force's responsibility) from completing, the final HVAC commissioning by the date on which he was terminated by Vertex (January 11, 2019).

    a. The parties spent a significant amount of time during trial presenting evidence of, and arguing about, a "punch list" of items the customer (and thus Vertex) was demanding that Kudsk complete while all parties were waiting for the boilers to be repaired. Kudsk presented unrebutted evidence that: (1) these items were minor and would take very little time to complete [Exh. 122; Dec. 11, 2019 tr. at 27:19 – 30:19; 123:22 – 126:17]; and (2) Kudsk and Kudsk's vendors had not been paid in a timely fashion for previous work (a breach of the Subcontract Agreement by Defendants as noted previously) [discussed *infra*]. It thus made no sense to go to the jobsite and incur additional costs, in time and manpower, to complete these tasks until the Air Force's boilers were fixed so that the commissioning could be done concurrently.

    b. Moreover, since the items were presented as a "punch list" or draft punch list, Kudsk was entitled to believe the customer considered the company's work substantially complete. Punch lists are lists of items that need attention that are generally presented at the completion of a project. The particular punch list in this case appears to have been crafted by the Air Force in order to sustain a frivolous argument, *i.e.*, that the entire delay of *months* that was, in

---

electricians," which Kudsk contended was unnecessary and caused further delay, the removal of the Quality Control Manger, and ultimately the boiler delay that suspended work from October 11, 2018 through January 11, 2019.

15

     reality, attributable to the Air Force's incompetence in getting the boilers repaired should be laid at the feet of Kudsk, who needed only a few days to complete the minor remaining punch list work. The Court rejects the Air Force's – and thus Vertex and F&D's – "critical path" argument and finds that the delay in completion was not Kudsk's fault.

  c. The Court also flatly rejects any argument by Defendants that the Air Force was entitled to demand that Kudsk immediately return to the jobsite when the Air Force announced on December 20th that the boilers were finally working (a claim the Air Force had mistakenly made on previous occasions, and was, again, not strictly true). [Dec. 11, 2019 Tr. at 177:4:19; Kudsk Decl., ¶61 (the Air Force wanted Kudsk to return to the site the day after Christmas).] Kudsk returned to the jobsite with reasonable alacrity, assisted in getting the boilers finally functional, and was then prevented from completing the remaining work.

Because the Court finds in favor of Kudsk on the HVAC contract and Miller Act claims, it need not address F&G's third-party beneficiary breach of contract counterclaim, which must necessarily fail because Kudsk substantially completed the Vandenberg work. The Court notes however, that even if F&G had demonstrated that it was a third-party beneficiary and was entitled to compensation based on some failure by Kudsk (which it has not), the Court would nevertheless find that F&G had not proved an essential element of its claim, *i.e.*, recoverable damages. F&G made the somewhat outlandish claim that every penny spent "on the project" for many months after Kudsk's alleged default was attributable to Kudsk. F&G's witness on this topic lacked credibility, as he had not done, nor did F&G otherwise present, any real analysis of what went into the total dollar amount claimed. And, on cross examination, it became clear that the witness had swept

16

every possible expenditure – including snacks and sodas that were purchased by an individual Vertex employee when he visited the job site – into the alleged damages. [Dec. 12, 2019 tr. at 177:20 – 180:24.] As noted, the Court finds this incredible. Moreover, the Court was not presented with any way to go through each line item to figure out which costs might have made sense and which were – to put it colloquially – silly. In sum, F&D failed to prove damages, a critical element of the counterclaim.

Based on these findings, the Court awards Kudsk $236,910.89 on the Vandenberg HVAC project. Defendant F&G shall take nothing on its counterclaim.

### C. THE FIRE ALARM PROJECTS

The background for this particular contract dispute tracks the facts set forth above with respect to the HVAC project. In other words, FSG defaulted on its contracts with the Air Force; F&D, as surety, entered a takeover agreement with the Air Force; Kudsk executed a ratification agreement with F&D; Kudsk responded to an RFP that included the fire alarm projects; and Kudsk and Vertex later entered the Subcontractor Agreement. As set forth, *infra*, however, the fire alarm projects were in a different posture than the Vandenberg HVAC work.

The parties do not dispute that there were multiple fire alarm projects expected to be performed at various locations. The actual construction on four of the five projects was completed, with only certain "closeout and as builts," and provision of warranties for the next year, left unfinished.

Kudsk put in a bid for all five fire alarm projects, including for the completed projects. Although Kudsk did not do any further work on these projects, he claims entitlement to $2,500 for the warranties on these projects. In other words, he claims he stood ready to provide warranty work, if necessary (no warranty work was required during the alleged warranty period), and thus is entitled to $10,000. [Kudsk Decl., ¶34.] With respect to this warranty claim, the Court finds that Kudsk

is not entitled to payment. Kudsk was aware, given the communications problems that he had with the Air Force and Vertex, that he was never given the "green light" on these projects for post FSG-default work.[6] The Court holds that nothing in the contracts presented entitles Kudsk to the claimed $10,000 payment.

The primary fire alarm dispute on which the parties focused at trial concerned the TLF Fire Alarm Project. This project was an anomaly, in that the Air Force had initially (pre-FSG default) given the contractor the green light to begin work, but halted work before it began because it needed the TLF to house personnel for some period of time. Although there was initially some conflicting testimony during trial on this point, the evidence ultimately showed that the Air Force never issued a "Notice to Proceed" for this project, and thus, Vertex never provided a Notice to Proceed to Kudsk.[7] [Kudsk Decl., ¶30 ("I never received authorization from Vertex to proceed with the work.").] Kudsk testified that he did not know why he never received such a Notice. Vertex gave him "various explanations" but "to this day" he "do[es] not know the exact reason . . . the TLF Fire Alarm Project was not commenced." [*Id.*]. He testified that despite this confusion, he completed certain administrative and other preparation work for which he should be compensated. [*Id.* at ¶31 ("[A]fter five months of waiting I proceeded to collect the necessary Air Force signatures on a Work Clearance Request and submit the document to the Air Force so that I could start work.").] Kudsk contends that he is entitled to compensation for "the actual administrative work performed" as well as the profit he would have made on this project [Kudsk Decl., ¶34] because Vertex, according to Kudsk, had a duty to obtain the Notice because the Subcontract

---

[6] Kudsk's claim for warranty work arises out of F&D's alleged breach of the Ratification Agreement. Kudsk's claim for lost profits arises out of allegations that Vertex breached the Subcontract Agreement.

[7] Notably, no Notice to Proceed on the TLF project was contained in any of the exhibits proffered to the Court. Presumably, if any of the parties had such a document, it would have been produced during discovery.

Agreement contained a "time is of the essence" provision [HVAC 18, ¶6.4] and Vertex interfered with his ability to work with the Air Force directly to obtain the Notice.

As Defendants correctly note in their post-trial briefing, the rights and obligations of Kudsk and Vertex relating to the TLF Fire Alarm project are contained in the Subcontract Agreement, which unambiguously states that "[t]he date of commencement shall be provided in a Notice to Proceed." Ex. FA20, Art. 6.1. No such notice was ever provided by Vertex to Kudsk. Kudsk contends, however, that since work on the TLF Project was to be completed within "180 calendar days from the Notice to Proceed" [*id*. ¶ 6.3.], and Paragraph 6.4 of the agreement stated that "time is of the essence" as to both parties' obligations, the Court should read into the contract that Vertex had a duty to obtain (and countersign) a Notice to Proceed. The Court cannot find any such duty in the Subcontract Agreement or any other document.

The Court previously described the communications problems Kudsk had with both the Air Force and Vertex. But while Kudsk may have expected he could communicate directly with the Air Force, he had no "right" to do so under the Subcontract Agreement. And in this instance, he was told – whether at the Air Force's insistence or based on a Vertex decision – not to do so. As previously noted, there is no contract provision that required Vertex to somehow acquire a Notice to Proceed from the Air Force (and Vertex presented evidence that it attempted to do so anyway). The provision noting that "time is of the essence" to the parties cannot, by itself, impose a duty on Vertex that did not otherwise exist. It remains undisputed that the Air Force never issued, and Kudsk never received, a notice to proceed on the TLF Fire Alarm project.

Based on the facts and law set forth herein, the Court holds that Kudsk's claim for payment based on the pre-Notice administrative activities he performed, and for lost profits from the TLF Firearm Project, fails.

19

# CONCLUSION

Kudsk is entitled to an award of $93,190.50 on the Moffett Field claim and $236,910.89[8] on the HVAC project claims. Kudsk takes nothing on the remaining claims related to the Fire Alarm Projects. Defendant F&D takes nothing on its counterclaim related to the HVAC project.

Kudsk is ordered to prepare a proposed judgement addressing each claim in suit in accordance with the Court's order, which shall be provided to Vertex and F&D for review as to form. The proposed judgment shall be submitted to the Court on or before October 2, 2020.

Finally, the parties requested at trial that any issues related to attorney's fees be addressed after the Court issued its ruling. The parties are to file a status report containing a jointly proposed briefing schedule to address fees and costs, which shall also be submitted on or before October 2, 2020.

**IT IS SO ORDERED.**

DATED: September 16, 2020

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

---

[8] Kudsk's declaration claims $203,398.09 for the HVAC project. Kudsk's Post-Trial Brief [Dkt. 90] which references the specific invoices admitted at trial, adds to the amount set forth above, and appears to rectify a mistake in the "subcontract balance" from the original declaration. Should the parties dispute this number as a calculation error or similar mistake (*i.e., not* a dispute based on the Court's conclusion that Kudsk is entitled to full payment on the HVAC claims), they may address that with a joint pleading when they submit the proposed judgment. If there is a dispute and any pleading is submitted, the actual invoices supporting the calculation and the calculation itself shall be set forth for the Court's review.